**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-212 (RCL)** |
| **v.** | : | |
| | : | |
| **CHRISTINA TRAUGH,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Christina Traugh to four months' home detention as a condition of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

Christina Traugh, a 49-year-old nurse from Dillsburg, Pennsylvania, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol were $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Traugh pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of four months' home detention as a condition of a thirty-six month term of probation is appropriate in this case because Traugh (1) remained in the Capitol building, specifically in the Rotunda, for nearly ten minutes when it was clear that police were attempting to clear that area, (2) sent a private message on Facebook stating that the purpose of her trip to Washington, D.C. was to disrupt the certification of the electoral vote, (3) spread propaganda on Facebook in an effort to blame others for the January 6 riot and breach of the Capitol building, and (4) sent private messages demonstrating pride in having participated in the riot and lack of contrition.

The Court must also consider that Traugh's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Traugh's crime support a sentence of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

### Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 18 (Statement of Offense), at 1-3.

*Traugh's Role in the January 6, 2021 Attack on the Capitol*

On December 31, 2020, Traugh made plans to head to Washington, D.C. on January 6, 2021, with Christy Clark, Matthew Clark, and Paul Spigelmyer.[2] In a private message to another

---

[2] On February 8, 2021, the Clarks and Spigelmyer were charged by complaint with offenses relating to their conduct on January 6, 2021. *See United States v. Clark, et al.,* No. 21-cr-218 (APM), ECF 1. As discussed in more detail below, all three were sentenced to 24-months'

individual on Facebook, Traugh said that she was planning on meeting the other three on the morning of January 6 because "[t]he counting of the electoral votes is supposed to be at 1pm."

In the lead-up to January 6, Traugh asked many of her friends on Facebook to attend the rally. When one friend responded that she could not attend because of her work schedule, Traugh responded, "Take a personal, sick, vacation day…whatever you got…or call off. If the Commies win, we won't hafta worry about work…" After further discussion of various unfounded allegations and conspiracy theories regarding the presidential election, Traugh told the same friend, "I've been hearing [those conspiracy theories] from different places. I think the info is mostly accurate. I still want to make the statement of being present for the show in DC. Lol."

On the morning of January 6, 2021, Traugh drove from her home in Pennsylvania to a hotel in Rockville, Maryland. There, she met Matthew Clark, Christy Clark, and Paul Spigelmyer. The four of them then drove to Washington, D.C. and, attended the "Stop the Steal Rally" on the Ellipse, near the White House. After the former president finished speaking, they all made their way to the Capitol grounds.

---

probation on October 22, 2023; Spigelmyer's sentence also included 45 days of home confinement as a condition of probation. *See id.* at ECF 99, 101, 103.



*Image 1 – Screenshot of an image posted to Christy Clark's Facebook page showing (from left to right) Matthew Clark, Christina Traugh, and Christy Clark*

Traugh and her companions approached the Capitol grounds from the west, crossed the grounds on the north side, and approached the Capitol building on its east front at approximately 3:00 p.m. At that point, the riot was well underway. Hordes of rioters who, by 3:00 p.m., had successfully breached the East Rotunda Doors, attacking police and smashing glass in those doors in the process, crowded the East Stairs.

While Traugh likely did not witness the initial breaches of the East Rotunda Doors, she likely was aware that the Capitol had been breached by other rioters given that her companion Matthew Clark posted, "Capital building has been breached!" to Facebook at 2:22 p.m. on January

6. Christy Clark also sent a private Facebook message at 2:24 p.m. stating, "Capitol has been breached," and, at 2:26 p.m. stating, "We r headed there [the Capitol] now prepped [sic] for war."

While on Capitol grounds and outside of the East Rotunda Doors, Traugh took many photos of the chaos around her:



*Image 2 – Photo taken on Traugh's phone on the east side of the U.S. Capitol Building*



*Image 3 – Selfie photo from Traugh's phone of Traugh outside of the East Rotunda Doors*



*Image 4 – Photo taken on Traugh's phone outside of East Rotunda Doors*

Traugh, along with the Clarks and Spigelmyer, entered the Capitol through the East Rotunda Doors at approximately 3:04 p.m. As they crossed the threshold of the Capitol building, rioters inside rapidly shuffled backward as if trying to get out of the way. Closed circuit video ("CCV") operated by the United States Capitol Police shows Traugh and the others entering the building with momentum, suggesting that they either ran in or were pushed from the outside.



*Image 5 – Screenshot of CCV showing Traugh (circled in red) entering the Capitol through the East Rotunda Doors*

The four proceeded directly into the Rotunda, which was already packed with rioters. Almost immediately after they arrived in the Rotunda, a large contingent of law enforcement officers—many of them in riot gear—arrived and began to clear rioters from the area.



*Image 6 – Screenshot of CCV showing Traugh (circled in red) in the Rotunda filled with rioters and police*

Rather than turn around and leave, Traugh and her companions stood and watched for several minutes while police closed in. As they watched officers clearing the Rotunda, Traugh, Christy Clark, and Spigelmyer pulled their hoods over their heads and covered their faces, seemingly attempting to obscure their identities from the police or protect their mouths and noses from chemical irritants.



*Image 7 – Screenshot of CCV footage showing Traugh (circled in red) with her hood pulled up*

After being pushed out of the Rotunda by the police, Traugh and her companions exited the Capitol building at approximately 3:13 p.m.

On the day of the riot, Traugh texted and privately messaged at least three people to tell them she was "inside" the Capitol building. To one friend, she added that she was part of the "2nd wave of patriots in" and that the police "pepper sprayed us but when we got in it was still only Capitol police trying to get out."

On January 7, 2021, Traugh took to Facebook to spread false information about the riot. In multiple comments on Facebook, despite her very recent participation in the riot and storming of the Capitol, she claimed, without evidence, that it was "BLM antifa that broke in" and that the riot was a "[f]alse flag operation to place blame on Trump supporters."

On January 10, 2021, Traugh's Facebook friend informed her that a Fox News commentator had criticized those who participated in the January 6 riot and called for the former

president's impeachment. In response, Traugh said, "Well he's a commie retard too. . . Demon

crat."

On March 2, 2021, a Facebook friend of Traugh's let her know that Matthew and Christy

Clark had been arrested. Her friend also noted that he had told Traugh she should not go to

Washington, D.C. In response, Traugh said, "Lol."

Unlike her three companions, Traugh refused to sit for an interview with FBI agents

following her arrest.

*The Charges and Plea Agreement*

On June 21, 2023, the United States charged Traugh by criminal complaint with violating

18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On June 22, 2023, Traugh

self-surrendered at the federal courthouse in the Middle District of Pennsylvania. On June 29,

2023, the United States charged Traugh by a four-count Information with the same four offenses.

On July 19, 2023, pursuant to a plea agreement, Traugh pleaded guilty to Count 4 of the

Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement,

Traugh agreed to pay $500 in restitution to the Architect of the Capitol.

## II.     Statutory Penalties

Traugh now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).

As noted by the plea agreement and the U.S. Probation Office, Traugh faces up to six months of

imprisonment and a fine of up to $5,000. Traugh must also pay restitution under the terms of her

plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79

(D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not

apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Traugh's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Traugh, the absence of violent or destructive acts is not a mitigating factor. Had Traugh engaged in such conduct, she would have faced additional criminal charges.

 Traugh entered the Capitol building shoulder to shoulder with hundreds of other rioters. It is clear from her photos and the photos of her companions that they progressed past thousands of people to reach the upper terrace on the East side of the Capitol and make it through the East Rotunda Doors, which had been violently breached multiple times. Traugh and her friends excitedly and deliberately crossed the threshold of the Capitol building amidst blaring alarms.

While inside, Traugh stood by and watched while police cleared the Rotunda. She had a full view of the officers' effort. She knew, as she admitted to the PSR writer, that it was wrong of her to be there. *See* PSR ¶ 31. And yet she remained there observing as police were trying to get

her and the other rioters in the Rotunda to leave. Her disregard of the officers and clear signs that they should leave is an aggravating factor in this case.

Traugh's private and public statements both before and after the riot are similarly aggravating. Traugh was not at the Capitol without purpose. Rather, she intended to be at the Capitol during the "counting of the electoral votes." And she wanted to "make the statement of being present **for the show in DC**." Though friends warned her not to go to D.C. that day, she rejected their sound advice and went anyway.

Moreover, following the riot, Traugh expressed pride in being amongst the second "wave of patriots" to enter the building. Those who publicly criticized January 6 rioters, in her eyes, were "commie retard[s]" or "Demon crat[s]." And when her fellow rioters were arrested, her response was not regret, shame, or remorse. It was "Lol."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of home detention in this matter.

### B.  The History and Characteristics of Traugh

Traugh has worked as a Registered Nurse since 2012. As outlined in the PSR, Traugh has no criminal history. PSR ¶¶ 35-40.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Though Traugh quickly accepted the government's plea offer in this case and seemingly expressed some amount of remorse for her actions to the PSR writer, specific deterrence is nevertheless called for in this case. Following the riot, Traugh exhibited excitement and pride for her actions and the actions of other "patriots" on January 6. And the arrest of her compatriots seemingly left her unaffected. It was not until she was arrested that Traugh seemingly became remorseful. It is therefore not clear whether Traugh merely regrets that her actions led to her arrest and conviction, or whether she is genuinely remorseful about her conduct and recognizes the seriousness of what happened at the Capitol on January 6. Her failure thus far to meaningfully acknowledge the wrongfulness of her conduct demands specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Traugh based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Traugh has pleaded guilty to Count 4 of the Information, charging her with parading, demonstrating or picketing in a Capitol Building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several

factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24

("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Judges have imposed periods of incarceration in January 6 cases where a defendant's conduct has included one or more of the various aggravating factors present here. For instance, judges have imposed probation with significant home detention in other Section 5104(e)(2)(G) cases where the defendant blatantly ignored police presence and/or attempts to remove rioters. *See, e.g., United States v. Robert Chapman*, 1:21-CR-00676 (imposing 3 months' home detention and 18 months' probation where, among other things, defendant took photos while officers were trying to clear the Rotunda); *United States v. Leonard Gruppo*, 1:21-CR-00391 (imposing 3 months' home detention and 24 months' probation where defendant scaled a small wall on the Capitol grounds, spent six minutes inside the Capitol Building, and disregarded officer commands); *United*

*States v. Terry Brown*, 1:21-CR-00041 (imposing 30 days' home detention and 36 months' probation where, among other things, defendant was arrested after refusing to leave pursuant to law enforcement orders).

In *United States v. Joshua Bustle and Jessica Bustle,* 21-cr-238 (TFH), the defendants drove from Virginia to D.C. and were present at the Capitol Building on January 6. They entered the building through the Rotunda Doors after they were breached by other rioters approximately 20 minutes earlier. There were clear signs of damage in the area that the defendants entered as the doors' windows were smashed. The Bustles remained inside the Capitol for approximately 20 minutes and left. Traugh breached the Capitol through the same broken doors as the Bustles and with alarms blaring. The Bustles, like Traugh, did not engage in any threatening, violent or destructive activity, although Jessica Bustle made inflammatory statements about the riot on social media. Judge Hogan sentenced Joshua Bustle to 30 days' home detention as part of a term of 24 months' probation and sentenced Jessica Bustle to 60 days' home detention as part of a term of 24 months' probation.

In *United States v. Fox*, 21-cr-435 (BAH), the defendant breached the Capitol by climbing through one of the Senate Wing windows. Fox remained in the Capitol for less than two minutes, while Traugh remained inside for around ten minutes. Fox failed to express remorse for his actions, declaring that in terms of breaching the Capitol, "I'd do it again." While Traugh has not said that she would repeat her actions, she has failed to sincerely express genuine remorse for her participation in the riot. Judge Howell sentenced Fox to two months' home detention as part of a 36-month term of probation.

Nor would a sentence of four months' home detention as a condition of a 36-month term of probation lead to unwarranted disparities when compared to the sentences imposed on Traugh's companions on January 6 in *United States v. Clark, et al.,* 21-cr-218 (APM). In those cases, the government recommended sentences of 4 months' home detention as a condition of a 36-month

term of probation for the Clarks and a sentence of 14 days' incarceration as a condition of a 36-month term of probation for Spigelmyer.

At the outset, although Judge Amit. P. Mehta ultimately sentenced all three defendants to a 24-month term of probation (with Spigelmyer also receiving 45 days' home detention as a condition of probation), the government's sentencing recommendations in those cases were amply warranted and consistent with the sentences imposed by this Court and other judges of this district. So is the analogous sentence recommended by the government in this case. Further, although Traugh's conduct in connection with the January 6 attack was, in numerous respects, comparable to the conduct of her companions, several aggravating factors distinguish Traugh's case from her companions'. First, though all four defendants made inflammatory and prideful statements about the riot on social media, Traugh's discussion of the election certification in the lead-up to January 6 sets her apart from the Clarks and Spigelmyer. Specifically, ahead of January 6, Traugh told a friend that she would head to Washington, D.C. in the morning hours of January 6 because "[t]he counting of the electoral votes" would take place at 1:00 p.m. That statement exhibits a clear plan and intent to obstruct the Electoral College certification vote. Second, unlike her companions, Traugh refused to be interviewed with FBI agents following her arrest. That refusal alone underscores Traugh's lack of remorse and a greater need for deterrence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## IV.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Traugh must pay $500 in restitution, which reflects in part the

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

role Traugh played in the riot on January 6.[5] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Traugh's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 10.

V.    **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Christina Traugh to four months' home detention as a condition of a 36-month term of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Madison H. Mumma*
MADISON H. MUMMA
Trial Attorney (Detailee)
N.C. Bar No. 56546
601 D. St., NW
Washington, D.C. 20001
madison.mumma2@usdoj.gov
202-431-8603

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).